UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| AECOM TECHNICAL SERVICES, INC., ) | |
| Plaintiff, ) | |
| ) | Consolidated Civil Action No. |
| v. ) | 12-11382-PBS |
| ) | |
| MALLINCKRODT LLC, ) | |
| Defendant. ) | |
| _____ ) | |
| ) | |
| MALLINCKRODT LLC, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 12-11420-PBS |
| v. ) | |
| ) | |
| AECOM TECHNICAL SERVICES, INC., ) | |
| Defendant. ) | |
| _____ ) | |

August 3, 2015

Saris, Chief Judge.

**MEMORANDUM AND ORDER**

Mallinckrodt LLC (Mallinckrodt) hired AECOM Technical Services, Inc. (AECOM) to excavate and provide decontamination services at the site of a former columbium-tantalum (C-T) plant licensed by the Nuclear Regulatory Commission. The parties agreed that the "Target Price" for the project was $3.7 million. But after paying $12.8 million, Mallinckrodt terminated AECOM and hired another company to finish the job. AECOM and Mallinckrodt have now come to court to deal with the fallout from their breakup. Among other things, they accuse each other of breach of contract, bad faith, and unfair and deceptive business practices.

Following discovery, the parties filed cross-motions for summary
judgment. (Docket Nos. 85, 89). For the following reasons, the
Court **ALLOWS IN PART AND DENIES IN PART** AECOM's motion for
summary judgment (Docket No. 85), and **ALLOWS IN PART AND DENIES
IN PART** Mallinckrodt's motion for summary judgment (Docket No.
89).

## I. STATEMENT OF UNDISPUTED FACTS

### A. AECOM's Bid Proposal

Mallinckrodt formerly operated a plant in St. Louis,
Missouri that extracted columbium and tantalum compounds from
ores. In 2009, Mallinckrodt sought a contractor to decommission
the facility. Phase I of the plan–demolishing the plant–was
complete. Now Mallinckrodt was seeking a contractor to execute
Phase II, which involved decommissioning the facility's floor
slabs, foundations, sewers, pavement, sediment basins, and land.
Mallinckrodt included a copy of the Phase II plan in its Request
for Proposal, which described Mallinckrodt's efforts to measure
the level of radioactivity at the site. Based on these efforts,
the Phase II plan estimated that there was potentially 129,000
cubic feet of subsurface radioactive waste to be decontaminated
or removed. (Docket Nos. 88-7:25, 88-12:23).

AECOM emerged as a candidate for the project and entered
into negotiations with Mallinckrodt. On one occasion, AECOM
asked:

2

> You previously indicated that the volume and footprint of the contamination is considerably larger that [sic] outlined in the decommissioning plan. Should [AECOM] address the additional cost and schedule impacts to project logistics, schedule and price?

(Docket No. 94-5:3). Mallinckrodt responded:

> As with any remediation job, you can do all the pre-characterization you want but will never exactly know how big the excavation will be until you put a shovel in the ground. The scope of the work is to excavate until cleanup criteria is met. The area identified in the Phase II plan was estimated based on the pre-characterization data and should not be considered the limits of excavation or scope. For the purpose of preparing the Final Status Survey as required by the [Nuclear Regulatory Commission] the entire area of the CT processing buildings will need to be addressed in some matter whether it be removing concrete pads and foundations or excavating contaminated soils.

(Docket No. 94-5:3).

After a competitive bidding process, Mallinckrodt selected AECOM's bid proposal. AECOM stated that it would employ the "most cost-effective methods" to complete the project. For example, AECOM proposed to use "real-time instrumentation" such as GPS-correlated gamma survey equipment and high resolution gamma spectrometers to detect the relative levels of radiation coming from different parts of the site. Using this data, AECOM stated that it would be able to calculate and compare the cost of decontamination versus bulk disposal for any given area. AECOM referred to this approach as a "surgical" technique to decrease the volume of material that would be excavated and shipped off-site for disposal, thereby minimizing costs.

With respect to pricing, AECOM's bid proposal stated that

3

the project involved several logistical and operational challenges including: (1) unknown quantities of materials, radioactivity levels of materials, and the cost-benefit of segregation and decontamination; and (2) unknown subsurface conditions that may impact excavation techniques and excavation production. Given these unique variables, AECOM explained that the project was not conducive to a Lump Sum or Unit Rate pricing structure because of how "site unknowns" might potentially affect the project. Instead, AECOM proposed a "Partnered Payment Structure" that included a Target Cost of $2.7 million and a fee based on the difference between actual costs and the Target Cost. According to AECOM, the Target Cost was based on the estimates in Mallinckrodt's Phase II plan.

The parties entered into two contract documents, a Master Environmental Services Agreement and a First Amendment. In relevant part, the Master Environmental Services Agreement stated in a section titled "BILLING AND PAYMENT/MECHANIC'S LIENS":

> [Mallinckrodt] shall not be obligated to pay to [AECOM] any amount in excess of the Contract Price for a project. However, if requested by [AECOM], [Mallinckrodt] may approve by way of a written Change Directive an increase to the Contract Price or Budget from time to time and in [Mallinckrodt's] sole discretion.

(Docket No. 88-18:5). The First Amendment further stated in a section titled "Compensation":

> AECOM shall be reimbursed for actual costs incurred with incentives . . . The contract shall be based on the Target Price described in Section 5.2 of this Amendment. This Target

4

Price shall be based on AECOM's Costs plus the incentive fees described in Section 5.5 and 5.6

. . .

Target Price: The Target Price for this Project is $3,700,000. This price includes all Costs associated with conducting all activities described in the Contract Documents

. . .

Adjustments to the Target Price: The Target Price will only be adjusted if there is a significant unforeseen event, material, or site condition which is outside of the scope of the work described in any and/or all Contract Documents. Any such Adjustment must be agreed to in writing by both parties

. . .

Target Volume: The parties recognize that efficient soil management and environmental practices will minimize the volume of soil that must be disposed of off-site. Based on pre-excavation characterization and volumetric estimates by [Mallinckrodt], a Target Volume of 3,419 tons of regulated soils from Plant 5 for removal has been established.

Incentive Project Fee: The Incentive Project Fee will be based on the difference between the Target Price and the total project Costs. Should the total Cost of the Project be less than the Target Price . . . [Mallinckrodt] and AECOM will share equally the savings . . . Should the total costs of the Project exceed 94% of the Target Price, AECOM will be reimbursed a minimum of Cost plus three percent (3%) or the Incentive Project Fee described in this section, whichever is the greater amount.

(Docket No. 88-22:7-8).

## B. Delays and AECOM's Requests for Additional Funding

AECOM began working at the site towards the end of 2010, but issues regarding the magnitude and cost of the project soon came to the surface. In May 2011, AECOM stated in a progress report that "based on revised estimates of contaminated material in

place, the current budget is likely to be insufficient." (Docket
No. 94-77:3). A month later, AECOM submitted a Change Request and
Authorization seeking an additional $4.5 million over the Target
Price and estimating that it would complete the project by
October 31, 2011. AECOM stated that it needed the increased
budget because: (1) the radioactive contamination volume was
larger than originally estimated; and (2) the project had
suffered unexpected costs relating to weather delays, delays
caused by other Mallinckrodt contractors, and support to other
Mallinckrodt projects. AECOM now estimated that the total volume
of radioactive material to be removed was nearly 684,000 cubic
feet (25,333 cubic yards x 27 cubic feet/cubic yard), which is
over five times the volume of radioactive material estimated in
the Phase II plan. Mallinckrodt responded that it did not approve
any adjustment to the Target Price. Nevertheless, Mallinckrodt
stated that "for internal AECOM accounting purposes . . . AECOM
may spend up to an additional $4 MM in order to continue
performing the Services." (Docket No. 90-104:1).

Three months after submitting the change request, AECOM
submitted a second one in September 2011, seeking to spend an
additional $5.66 million and bringing the proposed total budget
to $13.36 million. (Docket Nos. 94-111, 94-112). AECOM also
further pushed back its estimated date of completion to March
2012. These new estimates, AECOM stated, were based on a "more

6

detailed analysis" of the amount of excavation that remained. AECOM also described the new estimate as "conservative" and reassured Mallinckrodt that the company was seeking efficiencies wherever possible and intended to complete the project under the total amount requested and within the timeframe outlined in the new proposed schedule. Mallinckrodt again refused to adjust the Target Price but authorized AECOM to spend up to an additional $4 million, bringing the total budget to $11.7 million.

AECOM submitted a third request for additional funds in February 2012. The company now requested authorization to spend an additional $3.57 million and to increase the budget to $15.3 million. (Docket No. 94-129). AECOM stated that its request was based on the "factors cited in the previous request." Additionally, AECOM stated that water management costs had increased to avoid delays in excavation. Beyond that, AECOM delayed its estimated date of completion yet again to May 15, 2012. Mallinckrodt refused to adjust the Target Price but authorized AECOM to spend an additional $2 million, bringing the total budget to $13.7 million.

By April 2012, AECOM had already exceeded the new budget, with total spending at $14.36 million. As a result, AECOM again requested additional funding, estimating that raising the budget to $15.3 million would allow for two to three more weeks of work. Several days later, AECOM also told Mallinckrodt that it now

estimated that completion of the project would require a total budget of $17.9 million, which would include a 3% fee to AECOM of over $520,000. AECOM explained that excavation in other areas of the plant had taken much longer than expected because: (1) delays from initial efforts to minimize waste; and (2) the significantly greater amount of material requiring removal.

This fourth plea for more money triggered a meltdown. Mallinckrodt rejected the request for additional funds. The company also complained that, in each of its prior requests, AECOM had stated that the authorization for more funds would complete the project. Yet each time AECOM came back a few months later asking for more money and more delays. As a result, Mallinckrodt stated that it was "evaluating its options on how to proceed with this project and requires additional time to determine how to proceed with this site work."

Over the next month, Mallinckrodt approached AECOM about amending the contract to include a lump sum not to exceed amount. AECOM reported that it had spent $15.4 million to date and would require an additional $3.48 million to complete the project. After adding AECOM's three percent fee of approximately $567,000, AECOM's estimated total cost of the project was $19.46 million. Mallinckrodt also approached Energy Solutions, Inc. about taking over the project on a lump sum basis. On May 23, 2012, Mallinckrodt terminated AECOM and hired Energy Solutions to

complete the project for approximately $5.4 million. (Docket Nos. 94-151:2-3, 94-155:2).

## C. Violation of a St. Louis Water Permit

In addition to the delays and cost overruns, Mallinckrodt alleges that AECOM violated a sewer permit issued by the City of St. Louis. In November 2011, AECOM discontinued all wastewater discharges after discovering that some of the discharges may have exceeded the radioactivity limits set by Mallinckrodt's permit with the St. Louis Sewer District. (Docket No. 94-118). AECOM stated that the root cause of the discharges appeared to be a failure to monitor the water treatment system and a delay in reviewing laboratory analytical results. One month later, the Metropolitan St. Louis Sewer District issued a Notice of Violations to Mallinckrodt, alleging that the project's water discharges contained elevated levels of radiation. (Docket No. 99). In response, AECOM conducted an investigation into the incident, designed and installed a new water treatment system, and adjusted its standard operating procedures for water treatment and discharges. Despite this issue, Mallinckrodt approved AECOM's third change request for additional funds in March 2012.

## D. Procedural Background

Soon after AECOM's termination, the battle between AECOM and Mallinckrodt began. Both companies take aim at each other with a

proliferation of claims. AECOM alleges breach of contract (Count 1); quantum meruit/unjust enrichment (Counts 2-3); breach of the covenant of good faith and fair dealing (Count 4); unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A (Count 5); misrepresentation (Count 6); and declaratory judgment (Count 7). Meanwhile, Mallinckrodt alleges claims for breach of contract (Counts 1-4); negligence (Count 6); unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A (Count 7); and breach of the covenant of good faith and fair dealing (Count 8). Both parties now move for summary judgment.

## II. LEGAL STANDARDS

Summary judgment is appropriate when there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence supporting the non-moving party's case." Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The burden then shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. Quinones v. Houser Buick, 436 F.3d 284, 289 (1st Cir. 2006). A genuine issue exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l

Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is "one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

In its review of the evidence, the Court must examine the facts in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. Sands, 212 F.3d at 661. Ultimately, the Court is required to "determine if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. (quotation marks omitted). A party cannot avoid summary judgment by merely relying on "conlusory allegations, improbable references, and unsupported speculation." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) (quotation marks omitted); see also Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18 (1st Cir. 1999) (refusing to "indulge rank speculation or unsupportable hyperbole" at the summary judgment phase).

### III. DISCUSSION

This case is full of material fact disputes that will have to be resolved by a jury. As a result, the Court finds that summary judgment is only appropriate for (1) Mallinckrodt and AECOM's Chapter 93A claims; (2) AECOM's negligent misrepresentation claim; and (3) AECOM's request for a declaration that the contract between the parties is void. In all

other respects, AECOM and Mallinckrodt's motions for summary
judgment are denied.

## A. Chapter 93A Claims - Whether the Acts or Practices Occurred Primarily and Substantially within Massachusetts

Mallinckrodt and AECOM's Chapter 93A claims (Mallinckrodt
Count 7 and AECOM Count 5) fail as a matter of law because the
actions and transactions underlying the claims did not occur
"primarily and substantially" within Massachusetts. See Mass.
Gen. Laws ch. 93A, § 11.

Before reaching the merits of a Chapter 93A claim, the Court
must "determine whether the center of gravity of the
circumstances that give rise to the [§ 11] claim is primarily and
substantially within the Commonwealth." Kuwaiti Danish Comput.
Co. v. Dig. Equip. Corp., 781 N.E.2d 787, 797 (Mass. 2003). The
determination cannot be "reduced to any precise formula" but
rather requires a "fact intensive and unique" inquiry for each
case. Id. at 798. "Contacts with Massachusetts that were neither
unfair nor deceptive do not play a part" in this assessment. RGJ
Assocs., Inc. v. Stainsafe, Inc., 338 F. Supp. 2d 215, 234 (D.
Mass. 2004); see also Kenda Corp. v. Pot O'Gold Money Leagues,
Inc., 329 F.3d 216, 236 (1st Cir. 2003) (no Chapter 93A liability
when "virtually all the conduct that can be said to be unfair or
deceptive" occurs outside the Commonwealth, even if other
"ancillary" conduct took place in Massachusetts (quotation marks
omitted)). "[I]f the significant contacts of the competing

12

jurisdictions are approximately in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." <u>Fishman Transducers, Inc. v. Paul</u>, 684 F.3d 187, 197 (1st Cir. 2012) (Souter, J.) (quotation marks omitted). Under this legal framework, both Mallinckrodt and AECOM's Chapter 93A claims did not occur "primarily and substantially" in Massachusetts.

Mallinckrodt's Chapter 93A claim essentially alleges that AECOM's bid proposal and requests for additional funds were unfair and deceptive. But for the "low-ball" bid and estimates, Mallinckrodt claims that it would not have selected AECOM for the project or approved of AECOM's repeated requests for additional funding. The following pivotal events and circumstances underlying this claim, however, were outside Massachusetts: (1) the nucleus of Mallinckrodt's relationship with AECOM was an excavation and decontamination project at a facility in St. Louis, Missouri; (2) requests for additional funding (including AECOM's allegedly false and fraudulent estimates) were typically submitted by an AECOM project manager based in Texas and approved by Mallinckrodt's Director of Environmental Remediation in Missouri; and (3) AECOM's bid proposal was submitted by its Texas office to Mallinckrodt employees in Missouri.

On the other side of the ledger, at least two AECOM employees in Massachusetts communicated with Mallinckrodt,

especially during the bidding process and prior to termination.
This included (1) AECOM Vice President Montgomery Lovejoy, who
served as Mallinckrodt's initial point-of-contact during the
bidding process and signed the First Amendment to the Master
Environmental Services Agreement; and (2) AECOM Vice President &
Chief Counsel Jon Mahoney, who received Mallinckrodt's official
termination of AECOM. Also, invoices were typically sent from
AECOM's office in Massachusetts to Mallinckrodt's project manager
in Missouri.

But these minor connections to Massachusetts do not change
the center of gravity for Mallinckrodt's Chapter 93A claims. The
Court recognizes that Lovejoy described himself as the "overall
sort of conscience of AECOM" during the bidding stage. But of the
three AECOM representatives who signed the bid proposal, only
Lovejoy was located in Massachusetts. Also, internal AECOM
discussions about pricing included many more employees from
outside of Massachusetts than within. And, as mentioned above,
once the project began, AECOM's Project Mananger in Texas
submitted four requests for additional funding to Mallinckrodt's
Director for Environmental Remediation in Missouri. In short,
Lovejoy and Mahoney's roles from Massachusetts were relatively
minor compared with the more influential roles played by others
in Texas and Missouri. After weighing these factors, the Court
agrees that Mallinckrodt's Chapter 93A claim did not "primarily

and substantially" occur in Massachusetts. Rather, the "center of gravity" for the unfair and deceptive acts was primarily in Missouri (the site of the project and Mallinckrodt's US headquarters) and Texas (the location of AECOM's project manager). For these reasons, the Court allows AECOM's motion for summary judgment on Mallinckrodt's Chapter 93A claim. (Count 7).

Similarly, the Court will dismiss AECOM's Chapter 93A claim (Count 5), which is based on Mallinckrodt's alleged (1) failure to provide accurate information regarding the volume of contaminated material; (2) refusal to adjust the Target Price; and (3) termination of AECOM and refusal to pay. Like Mallinckrodt's Chapter 93A claim, the "center of gravity" for all of this conduct is not "primarily and substantially" in Massachusetts. Rather, the vast majority of these interactions took place between Mallinckrodt employees in Missouri and AECOM employees in Texas. Also, these communications all concerned the scope and price of an excavation project in St. Louis. As a result, AECOM's Chapter 93A claim (Count 5) also fails as a matter of law.

**B. Negligent Misrepresentation**

The Court will also allow Mallinckrodt's motion for summary judgment on AECOM's negligent misrepresentation claim (AECOM

Count 6).[1] AECOM argues that Mallinckrodt falsely and negligently: (1) estimated the amount of contaminated material that would need to be removed from the site; and (2) promised that the Target Price would be adjusted if the site conditions were materially different than expected. Both of these arguments fail.

Under Massachusetts law, a defendant is liable for negligent misrepresentation when (1) in the course of his business, (2) he supplies false information for the guidance of others (3) in their business transactions (4) causing and resulting in pecuniary loss to others (5) by their justifiable reliance on the information, and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information. DeWolfe v. Hingham Centre, Ltd., 985 N.E.2d 1187, 1192 (Mass. 2013). Importantly, a defendant is not liable for representations that are merely a "matter of opinion, estimate or judgment." Nickerson v. Matco Tools Corp., 813 F.2d 529, 530 (1st Cir. 1987) (quoting Powell v. Rasmussen, 243 N.E.2d 167, 168 (Mass. 1969)). Rather, the statement must be "susceptible of actual knowledge." Id. "Honesty requires only that the maker of a representation speak in good faith and without consciousness of a lack of any

---

[1]Mallinckrodt's motion also refers to an intentional misrepresentation claim, but AECOM's opposition only addresses negligent misrepresentation. To the extent that AECOM's complaint alleges a claim for intentional misrepresentation, Mallinckrodt's motion for summary judgment is allowed without opposition.

basis for belief in the truth or accuracy of what he says." <u>Fox</u> <u>v. F & J Gattozzi Corp.</u>, 672 N.E.2d 547, 588 (Mass. App. Ct. 1996) (quoting Restatement (Second) of Torts § 552(a) comment a (1977)). Against this legal backdrop, AECOM's negligent misrepresentation claim falls short on several fronts.

1. Estimation of the Amount of Contaminated Material

To begin with, there is no evidence that Mallinckrodt failed to exercise reasonable care or competence in obtaining or communicating information about the amount of contaminated material at the site. AECOM argues that Mallinckrodt negligently described its estimates as "well-characterized" and "accurate" during pre-bid negotiations. In support of this point, AECOM relies on deposition testimony from Mallinckrodt employee Karen Burke, AECOM employee Ed Palser, and expert Daniel Caputo. (Docket Nos. 87 ¶ 20, 110 ¶ 33). But none of these people pointed to specific Mallinckrodt statements pledging to the accuracy of the estimates. Burke admitted that Mallinckrodt provided characterization data to AECOM for bidding purposes. But she also told AECOM that "you never really understand the volume of material. You can characterize a site, you know, 10,000 percent, and you never really know until you start excavating." (Docket No. 88-3:19). Similarly, Palser testified that Mallinckrodt directed AECOM to bid in accordance with the decommissioning plan. (Docket No. 88-23:9). But he did not say anything about

17

whether Mallinckrodt provided any express or implied warranty about the accuracy of estimates in the decommissioning plan. AECOM's best evidence comes from Caputo, who stated that Mallinckrodt's decommissioning plan "talks quite extensively about how well characterized it was." But Caputo does not point to any specific places in the plan containing such statements.

Meanwhile, the record contains numerous examples where Mallinckrodt disclaimed any warranty about the accuracy of its estimates. Before AECOM submitted its bid proposal, it sent an e-mail to Mallinckrodt stating that "you previously indicated that the volume and footprint of the contamination is <u>considerably</u> larger [than] outlined in the decommissioning plan." (emphasis added). Mallinckrodt responded:

> As with any remediation job, you can do all the pre-characterization you want but you will never exactly know how big the excavation will be until you put a shovel in the ground. The scope of the work is to excavate until the cleanup criteria is met. The area identified in the Phase II plan was estimated based on the pre-characterization data and should not be considered the limits of excavation or scope.

(Docket No. 94-5:3). This e-mail exchange occurred in October 2008, a year before AECOM submitted its bid proposal in October 2009. Beyond that, the decommissioning plan also consistently referred to the potential volumes of contaminated materials as estimates. <u>See</u> Docket No. 88-7:25 (referring to the "estimated" volume of contaminated subsurface soil, unreacted C-T ore, and total volume of potentially contaminated solid waste).

18

Similarly, the record also shows that AECOM was fully aware of the unknown amount of excavation that the project would entail, and they accounted for this x-factor accordingly. AECOM's bid proposal lists some of the logistical and operational challenges for the project as: (1) "Unknown quantities of materials, radioactivity levels of materials . . . and the cost-benefit of segregation and decontamination"; and (2) "Unknown subsurface conditions that may impact excavation techniques and excavation production." AECOM's bid proposal also stated that the project was not conducive to a lump sum amount because of the "potential impacts of site unknowns." (Docket No. 88-20:38). Even viewing the facts in the light most favorable to AECOM, the Court concludes there is no evidence about how Mallinckrodt should have derived its estimates or transmitted its uncertainty about its estimates to AECOM in a more reasonable or competent way. See Skowronski v. Sachs, 818 N.E.2d 635, 638 (Mass. App. Ct. 2004) (negligent misrepresentation when defendant "could have readily ascertained the truth" by other means).

AECOM responds that its position is supported by Craig v. Everett M. Brooks Co., 222 N.E.2d 752, 754-55 (Mass. 1965) and Nota Construction Corp. v. Keyes Associates, Inc., 694 N.E.2d 401, 403 (Mass. App. Ct. 1998). But these cases offer no assistance to AECOM. In Craig, a civil engineering firm agreed to place stakes in a real estate development to designate areas for

19

future construction. 222 N.E.2d at 754. But the firm misplaced several of the stakes, despite having written instructions about where they were supposed to go. Id. at 753 n.1. As a result, a reasonable jury could find that the firm should have known that its stakes were being placed in the wrong locations. Id. at 754. But unlike in Craig, there is no evidence here that Mallinckrodt should have known of mis-stakes in its estimates. Nor is there any evidence that Mallinckrodt actually knew that its information was faulty. See Hallmark Inst. of Photography, Inc. v. CollegeBound Network, LLC, 518 F. Supp. 2d 328, 332 (D. Mass. 2007) ("There is no allegation here that CollegeBound knew, or even could have known, that its prediction was untrue when it made the statement regarding yield to Hallmark."); D. Federico Co., Inc. v. Massachusetts, 415 N.E.2d 855, 857 (Mass. App. Ct. 1981) (no evidence that defendant "concealed the existence of borings reports or soil analyses which would have revealed the subsoil conditions or shown the unreliability of the estimates"). For this reason, Craig is not on point.

Nota actually further confirms that there is no negligent misrepresentation claim here. In Nota, an architectural firm told contractors that they should anticipate about 12,000 cubic yards of excavation in order to build a new school. 694 N.E.2d at 403. The complaint alleged that the firm possessed information demonstrating the presence of at least 24,000 cubic yards of

20

ledge that would need to be excavated. <u>Id.</u> But at summary
judgment, the Court found that the amount of subsurface material
was "a matter not susceptible of actual knowledge or one over
which [defendant] had control." <u>Id.</u> at 403-04. Also, the bid
specifications and terms of the contract did not vouch for the
accuracy of the amount of excavation. Instead, the contract
accounted for contingencies by providing for additional
compensation and equitable adjustment in the contract price. <u>Id.</u>
at 404. Just so here. AECOM has not presented evidence that the
amount of contamination was susceptible of actual knowledge, or
that Mallinckrodt had control over it. And as described above,
the bid specifications and terms of the contract all took into
account that the amount of subsurface material was unknown.
Without evidence that Mallinckrodt could have or should have done
a better job communicating its estimates, there can be no
negligent misrepresentation claim.

    2. Adjustments to the Target Price

    AECOM also argues that Mallinckrodt negligently
misrepresented that the Target Price would be adjusted if the
site conditions were materially different than expected. But
AECOM's only evidence of such a promise comes from the contract,
which states:

> <u>Adjustments to the Target Price</u>: The Target Price will only be
> adjusted if there is a significant unforeseen event, material,
> or site condition which is outside the scope of the work
> described in any and/or all Contract Documents. Any such

Adjustment must be agreed to in writing by both parties. (Docket Nos. 87 ¶ 24; 88-22:7). Because AECOM's negligent misrepresentation claim is essentially based on Mallinckrodt's failure to adjust the Target Price as promised in the contract, AECOM's relief lies in contract, not in tort. See Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 49 (Mass. 2009) ("[F]ailure to perform a contractual duty does not give rise to a tort claim for negligent misrepresentation. Plaintiffs who are unable to prevail on their contract claims may not repackage the same claims under tort law." (internal citations omitted)); Anderson v. Fox Hill Vill. Homeowners Corp., 676 N.E.2d 821, 823 (Mass. 1997) ("[F]ailure to perform a contractual obligation is not a tort in the absence of a duty to act apart from the promise made."). For these reasons, the Court allows Mallinckrodt's motion for summary judgment on AECOM's negligent misrepresentation claim (AECOM Count 6).

**C. Declaration that the Contract is Void - Mutual Mistake**

AECOM's plea for a declaration that the contract is void (AECOM Count 7) also fails as a matter of law. AECOM asserts for the first time in its opposition that the contract is void under a theory of mutual mistake because both parties entered into the contract with false assumptions regarding the volume of contamination at the site and the reliability of Mallinckrodt's characterization data. But AECOM's reliance on the doctrine of

22

mutual mistake is misplaced.

Under the doctrine of mutual mistake, "[w]here there has been a mistake between the parties as to the subject matter of a contract, there has been no 'meeting of the minds,' and the contract is voidable at the election of the party adversely affected." LaFleur v. C.C. Pierce Co., 496 N.E.2d 827, 830 (Mass. 1986). "The mistake must be shared by both parties, and must relate to an essential element of the agreement." Id.; see also Shawmut-Canton LLC v. Great Spring Waters of Am., Inc., 816 N.E.2d 545, 550 (Mass. App. Ct. 2004) (explaining that the mistake must "upset the very basis for the contract" (quotation marks omitted)). Importantly, a party bears the risk of a mistake when: (1) "the risk is allocated to him by the agreement of the parties"; or (2) "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." Davis v. Dawson, Inc., 15 F. Supp. 2d 64, 114 (D. Mass. 1998) (quoting Restatement (Second) of Contracts § 154 (1981)); see also Covich v. Chambers, 397 N.E.2d 1115, 1121 (Mass. App. Ct. 1979) (explaining that Massachusetts cases on mutual mistake are "substantially in accord" with the Restatement (Second) of Contracts). A party seeking rescission must show "clear and convincing evidence" of a mutual mistake. Browning-Ferris Indus., Inc. v. Casella Waste Mgm't, 945 N.E.2d 964, 975

(Mass. App. Ct. 2011). "Its equitable character places it in the sound discretion of the court amid the total circumstances of the dispute." Id. Also, the "parol evidence rule does not bar extrinsic proof of intent in these circumstances." Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 917 (Mass. 1993).

Applying this legal framework, mutual mistake is inapplicable here because AECOM was fully aware of the unknown quantity of contamination at the Mallinckrodt site when it entered into the contract. As mentioned above, Mallinckrodt informed AECOM before they submitted their bid that the amount of contamination estimated in the Request for Proposal could be inaccurate. More to the point, AECOM also acknowledged this in their bid proposal, highlighting on multiple occasions that the unknown quantity of contamination was one of the logistical challenges for the project. Because of the unknown quantity of contamination, AECOM and Mallinckrodt agreed to a special pricing structure where the parties would share the risk. If the costs ended up coming below the Target Price, both parties would share the benefits. But if the costs ended up exceeding the Target Price, AECOM explained that "a portion of AECOM's profit is at risk if we are not successful implementing the project to the target cost." (Docket No. 88-20:38). Based on this record, a reasonable jury could not find that the parties entered into the contract with mistaken assumptions about the quantity of

24

contamination. <u>See</u> <u>Covich</u>, 8 Mass. App. Ct. at 750 ("Neither
party to a contract can rescind it because the known and assumed
risk turned out to be greater than either or both expected it to
be." (quoting <u>Cook v. Kelly</u>, 227 N.E.2d 330 (Mass. 1967)).
Massachusetts law does not allow AECOM to go back in time to
refashion its risk-taking as a mistake. <u>Dover Pool and Racquet</u>
<u>Club, Inc. v. Brooking</u>, 322 N.E.2d 168, 171 (Mass. 1975)
(explaining that relief is precluded in a case of "conscious
ignorance or deliberate risk-taking").

AECOM responds that Mallinckrodt instructed them to solely
bid on the amount of material estimated in the Phase II
Decommissioning Plan. Based on these instructions, AECOM argues
that Mallinckrodt solely assumed the risk of any unforeseen
radioactive material that needed to be removed. But the record is
devoid of any such assumption of risk. Mallinckrodt's Request for
Proposal contained no indication that there was any cap or
maximum on the amount of material that would need to be removed.
AECOM's bid proposal also contemplated that the amount of
material to be removed was an unknown, which is why a lump sum
pricing structure would be infeasible. Mallinckrodt also told
AECOM that the estimates in the Phase II Plan should not be
considered the limits of excavation or scope of work. Both
companies therefore understood that the amount of material to be
removed was unknown. A reasonable jury would have to conclude

that this was a case of mutual risk-taking, not mutual mistake.[2]

**D. Remainder of AECOM and Mallinckrodt's Motions for Summary Judgment**

For the following reasons, the Court summarily denies the remainder of AECOM and Mallinckrodt's motions for summary judgment:

First, Mallinckrodt seeks summary judgment for its own and AECOM's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. But a reasonable jury could rule either way on the merits of these claims.

Mallinckrodt argues in Counts 1-2 that AECOM breached its promise to provide reliable information when it submitted inaccurate reports and estimates of the costs required to complete the project. Count 8 of Mallinckrodt's complaint similarly argues that these unreliable estimates breached the covenant of good faith and fair dealing. A jury might agree with Mallinckrodt. But a reasonable jury could also reject these claims. Viewing the facts in AECOM's favor, AECOM submitted its bid proposal assuming that Mallinckrodt's estimates in the Phase II Decommissioning Plan were at least in the ballpark of the amount of material that would need to be removed. Once AECOM

---

[2]Because the Court will allow Mallinckrodt's motion for summary judgment on this claim, the Court need not address Mallinckrodt's alternative argument that the AECOM's request for a declaratory judgment is invalid because it will not terminate the controversy.

began working at the site, however, it soon became clear that
Mallinckrodt's estimates were grossly incorrect. As a result,
AECOM attempted to provide the best estimates possible for how
much completing the project would cost and how long it would take
based on the information that was available. A reasonable jury
could certainly reject the claim that AECOM's estimates and
delays were mere attempts to endlessly string along Mallinckrodt
while the price of the project steadily grew.

By the same token, a reasonable jury could also find that
Mallinckrodt breached the covenant of good faith and fair
dealing. Mallinckrodt estimated in its Phase II plan that the
"total volume of <u>potentially</u> contaminated solid waste in C-T
Phase II is estimated to be 129000 [cubic feet]." (Docket No. 88-
7:25) (emphasis added). Based on this estimate of "potential"
contamination, the parties agreed to a Target Price of $3.7
million and a Target Volume of 3126 tons. As it turned out,
however, the potential for decontamination at the site was more
than five times worse. When AECOM made its first request to
adjust the Target Price in June 2011, it estimated that there was
actually about 684,000 cubic feet of material that might need to
be removed (25,333 cubic yards x 27 cubic feet/cubic yard), which
would likely weigh about 33,800 tons (Docket Nos. 90-102:2, 94-
129:5). Yet Mallinckrodt refused to adjust the Target Price
despite its flawed estimates. To add insult to injury, once the

27

vast majority of the work was complete, Mallinckrodt terminated AECOM and hired a competitor. By alleging a bogus breach of contract, Mallinckrodt could switch to a competitor and avoid paying AECOM's three percent fee. AECOM's competitors were also now willing to work on a lump sum not to exceed basis rather than a time and materials basis, which favored Mallinckrodt. A reasonable jury could certainly find that these actions destroyed AECOM's right to enjoy the fruits of the contract and are evidence of Mallinckrodt's bad faith.

Mallinckrodt also argues that it is entitled to summary judgment for Count 4 because AECOM breached the contract when it failed to manage waste water discharges, causing a violation of a sewer permit issued by the City of St. Louis. But the record for this claim also contains significant disputes of fact. To begin with, AECOM argues that it cured any potential breach by investigating the water discharge and revising its procedures. There is also a dispute of fact regarding whether Mallinckrodt suffered any damages from the breach. The parties dispute whether the violation caused any delays or costs for the project in the short term or harm to Mallinckrodt's record and reputation in the long term. As a result, Count 4 of Mallinckrodt's complaint must also proceed to trial.

Second, AECOM argues that several of Mallinckrodt's claims are duplicative. Specifically, AECOM argues that the warranty and

negligence claims are duplicative (Mallinckrodt Counts 2, 3, and 6); and (2) the claims for breach of the covenant of good faith and fair dealing and breach of contract are duplicative (Mallinckrodt Counts 1 and 8). Relatedly, Mallinckrodt argues that AECOM's claims for breach of contract and quantum meruit/unjust enrichment are mutually exclusive theories of recovery (AECOM Counts 1-3). The Court agrees that many of these claims are based on the same-or mutually exclusive-underlying facts and theories of recovery. Nevertheless, the Court will encourage the parties to prove these claims at trial, and will ensure that no duplicative or mutually exclusive damages are awarded. See Szalla v. Locke, 657 N.E.2d 1267, 1271 (Mass. 1995) ("Where the same acts cause the same injury under more than one theory, duplicative damage recoveries will not be permitted.").

Third, AECOM argues that Mallinckrodt's express warranty claim (Mallinckrodt Count 2) cannot be based on any promises made in AECOM's bid proposal because (1) the bid proposal was never incorporated into the contract; and (2) any such promises constitute mere puffery. Both of these arguments miss the mark.

To begin with, the Court rejects the argument that AECOM's bid proposal was not incorporated into the contract between AECOM and Mallinckrodt, at least with respect to AECOM's description of the scope of services it would provide. To incorporate extrinsic material, the language of the contract "must clearly communicate

29

that the purpose of the reference is to incorporate the
referenced material into the contract." <u>NSTAR Elec. Co. v. Dep't
of Pub. Utils.</u>, 968 N.E.2d 895, 905 (Mass. 2012) (quotation marks
omitted). Here, the undisputed contract documents expressly
incorporate AECOM's bid proposal and repeatedly refer to it
throughout. The First Amendment to the Master Environmental
Services Agreement defines "Contract Documents" for the project
to include AECOM's bid proposal. The contract also states that
the scope of AECOM's services covered under the contract is
"described in greater detail in the AECOM Proposal." Throughout
the Amendment, the agreement also refers to "Contract Documents"
when talking about the scope of services and project schedule.

AECOM's bid proposal was also not mere puffery as a matter
of law. Massachusetts courts have recognized that "loosely
optimistic statements that are so vague, so lacking in
specificity, or so clearly constituting the opinions of the
speaker" may constitute mere "puffing" or "sales talk" upon which
no reasonable person could rely. <u>Shaw v. Dig. Equip. Corp.</u>, 82
F.3d 1194, 1217-18 (1st Cir. 1996) <u>superseded by statute on other
grounds</u> (collecting cases); <u>see also</u> <u>Greenery Rehab. Grp., Inc.
v. Antaramian</u>, 628 N.E.2d 1291, 1293 (Mass. App. Ct. 1994)
(characterizing tenants as "solid" and "good as gold" was "so
general as to amount to puffery"); <u>Moran v. Levin</u>, 64 N.E.2d 360,
362 (Mass. 1945) (sellers are "allowed some leeway" for "puffing"

(quotation marks omitted)). But a reasonable jury could find that many of the statements in AECOM's bid proposal were specific enough to be more than just puffery or sales talk. For example, AECOM's bid proposal stated that the company would use real-time survey equipment to guide excavation activities. AECOM also stated that it would use the data to minimize unnecessary excavation, heavy equipment costs, soil volumes, and soil stockpiles.

Finally, AECOM seeks a declaration that Mallinckrodt owes any outstanding costs plus a three percent incentive fee under the contract. In relevant part, the contract states:

> Incentive Project Fee: The Incentive Project Fee will be based on the difference between the Target Price and the total project Costs. Should the total Cost of the Project be less than the Target Price . . . [Mallinckrodt] and AECOM will share equally the savings . . . Should the total costs of the Project exceed 94% of the Target Price, AECOM will be reimbursed a minimum of Cost plus three percent (3%) or the Incentive Project Fee described in this section, whichever is the greater amount.

(Docket No. 88-22:8). The Court interprets the plain language to mean that, at a minimum, AECOM should be reimbursed for its costs plus three percent under the contract. Mallinckrodt responds that this section was never meant to apply if the total costs of the project exceeded the target price. If it were otherwise, Mallinckrodt argues that AECOM would have no incentive to control the costs once the Target Price was exceeded. But this argument finds no support in the text of the contract. The contract

unambiguously states that if the total costs of the project exceeded 94% of the Target Price, AECOM would be reimbursed a minimum of cost plus three percent. This reading of the contract is perfectly consistent with logic and reason. Under this pricing structure, AECOM had an incentive to keep costs low because the parties would share equally in the savings if the total costs of the project came in below the target price. Granted, AECOM knew that it was guaranteed a fee of three percent of the cost. But it still had ample incentive to accomplish the project for less than the Target Price. Thus, the Court construes the contract to require Mallinckrodt to pay AECOM a minimum of cost plus three percent.

But this is not the end of the story. As described above, Mallinckrodt has presented evidence of AECOM's own material breaches of the contract, including a failure to provide accurate estimates and dates of completion. These breaches arguably justify and excuse Mallinckrodt's failure to pay. See Prozinski v. Ne. Real Estate Servs., LLC, 797 N.E.2d 415, 424 (Mass. App. Ct. 2003) ("It is well established that a material breach by one party excuses the other party from further performance under the contract." (quotation marks omitted)); Lease-it, Inc. v. Mass. Port Auth., 600 N.E.2d 599, 602 (Mass. App. Ct. 1992) ("Whether a breach is material or immaterial normally is a question for the jury to decide."). As a result, a trial is necessary for AECOM's

breach of contract claim to determine whether Mallinckrodt was excused from its duty to pay.[3]

### ORDER

The Court **ALLOWS IN PART AND DENIES IN PART** AECOM's motion for summary judgment (Docket No. 85), and **ALLOWS IN PART AND DENIES IN PART** Mallinckrodt's motion for summary judgment (Docket No. 89). The Court **ALLOWS** Mallinckrodt's motion for summary judgment on Counts 5-7 of AECOM's amended complaint. The Court **ALLOWS** AECOM's motion for summary judgment on Count 7 of Mallinckrodt's second amended complaint.


 /s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge

---

[3]The Court does not need to address AECOM's argument that Mallinckrodt's breach of contract claim (Count 1) fails to the extent it generally accuses AECOM of exceeding the $3.7 million Target Price. Mallinckrodt no longer argues that AECOM breached the contract when its expenditures eclipsed the Target Price. Instead, Count 1 is based on AECOM's alleged: (1) failure to provide accurate cost estimates and reports; (2) false representations regarding its ability to complete the project at certain costs; and (3) failure to complete the project within the deadlines and estimates it provided.